Albert James v. Commissioner.
James v. Commissioner
Docket No. 56574.
United States Tax Court
T.C. Memo 1957-198; 1957 Tax Ct. Memo LEXIS 50; 16 T.C.M. (CCH) 896; T.C.M. (RIA) 57198; October 21, 1957
*50 1. Held, that additional net income is chargeable to the petitioner for each of the years involved. The amounts are determined. 2. Held, further, that an addition to tax for fraud, under section 293(b) of the 1939 Code, should be imposed for the year 1945, but not for the year 1944. 3. Held, further, that an addition to tax under section 294(d)(2) of the Code, for substantial underestimate of estimated tax, should be imposed for each of the years involved. 4. Held, further, that assessment for the year 1944 is not barred by the statute of limitations, because of the applicability of section 275(c) of the Code, and the filing of consents which extended the period for assessment. 5. Held, further, that assessment for the year 1945 is not barred by limitation, because petitioner's return for such year was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of the Code. Mortimer Cole, Esq., for the petitioner. William G. O'Neill, Esq., and James C. Markham, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined income tax deficiencies and additions to tax, in respect of the petitioner, as follows: *51 Additions to Tax
Under-
Fraud
estimate of
Sec.
Estimated Tax
Year
Deficiency
293(b)
Sec. 294(d)(2)
1944
$ 7,352.58
$ 3,924.11
$ 508.76
1945
32,190.16
16,095.08
1,934.91
The issues for decision are: (1) Whether additional net income is chargeable to the petitioner for each of the years involved. (2) Whether any part of any deficiency for each of said years is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code. (3) Whether an addition to tax under section 294(d)(2) of said Code, for substantial underestimate of estimated tax, should be imposed for each of the years involved. (4) Whether assessment of any deficiency or addition to tax for each of said years is barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated; and the stipulation, together with the exhibits annexed thereto, is incorporated herein by reference. The petitioner is a resident of Skaneateles, New York. His income tax return for each of the years here involved was filed with the then collector of internal revenue for the twenty-first district of New York, at Syracuse, New York. Petitioner, at the time of the trial, was 57 years of age. In 1942 he had entered *52 the employ of the Barr Typewriter Corporation, a New York corporation, as an outside salesman and procurer of manufacturing materials. In 1944 the name of this company was changed to the Barr Manufacturing Corporation (hereinafter sometimes called "Barr"). At that time, the outstanding capital stock was owned by petitioner, Charles B. Hughes, Walter T. Smith, Herman Cohen, Ben Cohen, Morton Kowalski, and possibly one or two smaller stockholders, in amounts which are not established by the evidence. On December 5, 1944, Barr purchased the shares of Kowalski; and in 1945 it also purchased the shares of the two Cohens, leaving petitioner, Hughes and Smith as the principal stockholders. During the war period, the business of Barr expanded rapidly; sales increased from about 25 or 50 thousand dollars per month to about a million dollars per month, and the number of employees increased from about 50 to about 600. After the war, however, sales began to decline and the company attempted to develop new postwar products. Early in 1946, petitioner sold all of his shares in Barr, and terminated his relationship with the company. In 1947 the company went into bankruptcy, and all of its books and *53 records were turned over to a trustee. Throughout 1944 and 1945, the two years here involved, Hughes had charge of Barr's financial arrangements; and he, together with Smith, also supervised the operation of the plant. Petitioner was treasurer of Barr in 1944, and vice president in 1945. His principal activity was traveling for the company, in connection with the procurement of materials and the selling of products; and he was absent from the plant from 90 to 95 per cent of the time. He submitted vouchers to Barr, covering expenses incurred by him on his trips; and checks were then issued to him in reimbursement of such expenses. He signed many of Barr's checks; and he sometimes left signed blank checks with the company when he went away on trips. On December 4, 1944, a checking account was opened at the Auburn Trust Company, at Auburn, New York, under the name of "The Poole Company" (hereinafter sometimes called "Poole"), on which the authorized signatories were petitioner, Hughes, and Smith. Each of these persons personally signed the bank signature card. From time to time after this account was opened, invoices were presented to Barr in the name of Poole, which purported to cover *54 labor and materials furnished by Poole to Barr. These invoices were on forms which the purchasing agent of Barr had caused to be printed; and they indicated that Poole was a company located at Ithaca, New York. Actually, there was no Poole Company to which said bank account belonged; there was no office or plant of such a company at the address shown on said invoices; and there were no books and records of any such company. Furthermore, no labor or material was furnished by any such company to Barr. The purported invoices were fictitious. Barr issued checks in the name of Poole as payee, in purported payment of the above-mentioned invoices; and all of these checks were then endorsed with a rubber stamp bearing the Poole Company name, and were deposited in the above-mentioned account at the Auburn bank. A summary, showing the deposits in said account, the disbursements therefrom, and the names of the persons who received such disbursements, is as follows: DEPOSITS
Date
1944
Received From
Amount
Dec. 4
Barr Manufacturing Corp.
$ 25,718.89
1945
Jan. 11
Barr Manufacturing Corp.
5,515.00
Mar. 31
Barr Manufacturing Corp.
30,000.00
Apr. 2
Barr Manufacturing Corp.
30,000.00
June 1
Barr Manufacturing Corp.
9,608.00
June 1
Barr Manufacturing Corp.
9,485.00
June 1
Barr Manufacturing Corp.
15,350.00
June 1
Barr Manufacturing Corp.
13,882.00
June 1
Barr Manufacturing Corp.
19,675.00
Total Deposits
$159,233.89
*55 WITHDRAWALS
WITHDRAWALS
DISTRIBUTION TO
INDIVIDUALS
Date of
C. B.
Albert
Check
Payee
Amount
Hughes
James
a 12/30/44
W. T. Smith
3,055.77
a 12/30/44
Albert James
1,677.03
$ 1,677.03
a 12/30/44
C. B. Hughes
1,745.00
$ 1,745.00
a 12/30/44
D. P. Gallagher
718.00
a 12/30/44
Wm. E. Hughes
2,500.00
1/11/45
W. T. Smith
5,000.00
1/11/45
Albert James
5,000.00
5,000.00
1/11/45
C. B. Hughes
5,000.00
5,000.00
1/27/45
W. T. Smith
2,000.00
1/27/45
Albert James
2,000.00
2,000.00
1/27/45
C. B. Hughes
2,000.00
2,000.00
b *56 4/ 2/45
Auburn Tr. Co.
20,000.00
b 4/ 2/45
Auburn Tr. Co.
20,000.00
b 4/ 2/45
Auburn Tr. Co.
20,000.00
5/31/45
Barr Mfg. Co.
60,000.00
6/16/45
Barr Mfg. Co.
2,000.00
10/16/45
W. T. Smith
2,179.37
10/16/45
Albert James
2,179.36
2,179.36
10/16/45
C. B. Hughes
2,179.36
2,179.36
Total
$159,233.89
$10,924.36
$10,856.39
withdrawals
WITHDRAWALS
DISTRIBUTION TO INDIVIDUALS
Date of
W. T.
Wm. E.
D. P. Gal-
Check
Smith
Hughesc
lagher c
a 12/30/44
$ 3,055.77
a 12/30/44
a 12/30/44
a 12/30/44
$718.00
a 12/30/44
$2,500.00
1/11/45
5,000.00
1/11/45
1/11/45
1/27/45
2,000.00
1/27/45
1/27/45
b 4/ 2/45
b 4/ 2/45
b 4/ 2/45
5/31/45
6/16/45
10/16/45
2,179.37
10/16/45
10/16/45
Total
$12,235.14
$2,500.00
$718.00
withdrawals
All checks deposited in said Poole account were signed for Barr by Charles B. Hughes and Smith, except for one check in the amount of $5,515, which was signed by Charles B. Hughes and petitioner. All checks drawn on said account in favor of the above-mentioned payees were signed individually, either by Hughes and Smith, by Hughes and petitioner, or by Smith and petitioner. The checks issued to petitioner as payee, all of which were signed by Hughes and Smith, were deposited in one or another of petitioner's personal bank accounts. Also, on May 2, 1945, a checking account was opened at Merchants National Bank & Trust Co. at Syracuse, New York, under the name of "Universal Design and Consulting Service" (hereinafter sometimes called "Universal"), on which the authorized signatories were likewise the petitioner, Hughes, and Smith. Each of these persons personally signed the bank signature card. Thereafter, from time to time, invoices were presented to Barr in the name of Universal, which purported to cover *57 service charges and travel expenses of Universal in connection with work done by it for Barr. These invoices were on typewritten letterheads, which indicated that Universal was located in the Chimes Building at Syracuse, New York. Actually, as in the case of Poole, there was no Universal Company to which said bank account belonged; there was no office of such a company in the Chimes Building as shown on said invoices; and there were no books and records of any such company. Furthermore, no such services were rendered and no such travel expenses were incurred. The purported invoices of Universal, like those of Poole, were fictitious. Barr issued checks in the name of Universal as payee, in purported payment of the above-mentioned invoices; and all of these checks were then endorsed with a rubber stamp bearing the name of Universal, and were deposited in the above-mentioned account at the Merchants National Bank & Trust Co. A summary, showing the deposits in said account, the disbursements therefrom, and the names of the persons who received such disbursements, is as follows: DEPOSITS
Date
Received From
Amount
5/ 2/45
Barr Manufacturing Company
$ 4,000.00
6/ 5/45
Barr Manufacturing Company
9,910.30
7/ 5/45
Barr Manufacturing Company
4,938.30
$18,848.60
WITHDRAWALS
DISTRIBUTION
Date
Payee
Amount
C. B. Hughes
A. James
W. T. Smith
10/16/45
C. B. Hughes
$ 6,282.86
$6,282.86
10/16/45
A. James
6,282.87
$6,282.87
10/16/45
W. T. Smith
6,282.87
$6,282.87
$18,848.60
$6,282.86
$6,282.87
$6,282.87
All *58 checks deposited in said Universal account were signed for Barr by Hughes and Smith. All checks drawn on said account in favor of the above-mentioned payees were signed individually, either by Hughes and Smith, or by Hughes and petitioner, or by Smith and petitioner. The check issued to petitioner as payee was deposited in one of his personal bank accounts. During the year 1944, Barr paid petitioner (in addition to his salary) the amount of $12,432.89, which was allocated on Barr's records to operating expenses such as travel, sales and advertising; and during the year 1945, it paid him (in addition to his salary) the amount of $24,249.40, which was allocated to similar expenses. Portions of said amounts were paid by checks which were issued to petitioner on the same dates that other checks of similar amount, and bearing closely related check numbers, were issued to Hughes and Smith. This is shown by the following summary: To Petitioner
To Hughes
To Smith
Date
Check No.
Amount
Check No.
Amount
Check No.
Amount
Aug. 24, 1944
RF #29
$2,500
RF #28
$2,500
RF #30
$2,500
March 15, 1945
15084
2,000
15083
2,000
15085
2,000
April 30, 1945
15499
2,000
15498
2,000
15500
2,000
May 18, 1945
15651
2,000
15650
2,000
15652
2,000
June 14, 1945
1227
2,000
1228
2,000
1236
1,985
Aug. 3, 1945
Res 137
1,000
Res 138
1,000
Res 139
1,000
Oct. 19, 1945
2132
1,500
2135
1,500
2123
1,500
Petitioner, *59 on his income tax return for the year 1944, reported as his only gross income, compensation received from Barr Typewriter Company and Barr Manufacturing Corporation in the aggregate amount of $18,395.07; and on his 1945 return, he reported as his only gross income, compensation received from Barr Manufacturing Corporation in the amount of $19,602.26. In neither return was any mention made of the amounts which he received from Barr in addition to his salary, nor was any mention made of the several distributions which he received from Poole and Universal. Respondent began his examination of petitioner's returns in about 1947 or 1948. Thereafter, petitioner and respondent executed waivers or consents (Form 872), fixing the period of limitation upon assessment of income taxes, as follows: Re: Taxable year 1944
Consent Executed
Period extended to
February 28, 1950
June 30, 1951
January 9, 1951
June 30, 1952
May 13, 1952
June 30, 1953
March 31, 1953
June 30, 1954
April 14, 1954
June 30, 1955
Re: Taxable year 1945
February 2, 1949
June 30, 1950
February 28, 1950
June 30, 1951
January 9, 1951
June 30, 1952
April 14, 1954 * *60 June 30, 1955
The deficiency notice herein, respecting both of the years 1944 and 1945, was issued to petitioner on December 16, 1954. In said notice, respondent determined additional net income for the year 1944 in the amount of $13,583.06, and additional net income for the year 1945 in the amount of $46,889.08, as follows: 1944
Income from "The Poole Company"
$ 7,018.06
Additional income from Barr Manu-
facturing Corporation, representing
a portion of amounts purportedly
received in reimbursement expenses
4,000.00
Unallowable deduction for purported
automobile and entertainment ex-
pense
1,565.00
Unallowable loss for purportedly
worthless stock
1,000.00
$13,583.06
1945
Income from "The Poole Company"
$23,838.33
Income from "Universal Design &
Consulting Service"
6,282.87
Additional income from Barr Manu-
facturing Corporation, representing
a portion of amounts purportedly
received in reimbursement of ex-
penses
15,544.66
Unallowable deduction for purported
automobile, entertainment and other
expenses
1,000.00
Income from director's fees
100.00
Income from bank interest
123.22
$46,889.08 Respondent conceded at the trial that, of the income of $23,838.33 determined to have been received by petitioner from "The Poole Company" *61 in 1945, there should be excluded the amount of $20,000, representing one of the three checks of such amount which were issued out of the Poole bank account on April 2, 1945, for the purchase of Barr stock held by the Cohens. An adjusted net worth statement for petitioner respecting the years involved, showing his income as reconstructed by the net worth method, is as follows: Assets
1943
1944
1945
Cash in banks: Syracuse Trust Co. acc't #125385
$ 198.39
$ 2,514.80
$ 3,674.41
1st National Bank of Weedsport
111.72
Skaneateles Savings Bank
15,123.22
Syracuse Trust Co. - compound interest
5,037.56
acc't
The Poole Co. - (check issued to
1,677.03
petitioner on Dec. 30, 1944; deposited by
him on Jan. 2, 1945)
Stockholdings: James Langley Corp.
3,500.00
3,500.00
Barr Mfg. Corp.
10,000.00
10,000.00
10,000.00
U.S. Savings Bonds (at cost)
2,275.00
5,762.00
16,887.00
Total Assets
$15,973.39
$23,453.83
$50,833.91
Liabilities
Account payable - Barr Mfg. Corp. loan
$ 5,000.00
(repaid in 1945)
Notes & loans payable at Syracuse Trust
$ 3,225.00
1,525.00
Co.
Total Liabilities
$ 3,225.00
$ 6,525.00
Net Worth
$12,748.39
$16,928.83
$50,833.91
Less net worth at end of prior year
12,748.39
16,928.83
Increase in net worth
$ 4,180.44
$33,905.08
Add nondeductible items only: Miscellaneous personal expenditures
$11,149.51
$ 8,336.16
Nondeductible portion of capital losses
3,583.00
Estimated living expenses
8,280.00
8,280.00
Total Net Income
$23,609.95
$54,104.24
Less net income reported on return
15,390.63
15,596.79
Unreported Net Income
$ 8,219.32
$38,507.45
*62 Additional net income is chargeable to petitioner in the amounts of $8,242.03 for the year 1944, and $32,230.11 for the year 1945. No part of the deficiency for the year 1944 is due to fraud with intent to evade tax, within the meaning of section 293(b) of the 1939 Code; but at least part of the deficiency for the year 1945 is due to fraud with intent to evade tax, within the meaning of said section. Petitioner omitted from gross income for the year 1944, an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in his return for said year, within the meaning of section 275(c) of the 1939 Code. Petitioner's return for the year 1945 was false or fraudulent with intent to evade tax, within the meaning of section 276(a) of said Code. Opinion I. The first issue to be decided is whether the petitioner is chargeable with additional net income for each of the years involved. The several adjustments to reported net income, which the respondent determined in his notice of deficiency, have been set forth in our Findings of Fact; and the burden is of course on the petitioner to establish any error in these determinations. Since several of the *63 adjustments are similar for both years, we shall consider them by classes. 1. For the year 1944, respondent charged petitioner with unreported income from "The Poole Company" in the amount of $7,018.06; and for the year 1945, he charged petitioner with unreported income from Poole in the amount of $23,838.33, and with unreported income from "Universal Design & Consulting Service" in the amount of $6,282.87. As before mentioned, respondent conceded at the trial that, of the amount so charged to petitioner in 1945 in respect of Poole, $20,000 should be excluded on the ground that this sum had been used for the benefit of Barr in acquiring the shares of stock of that company which had been held by the Cohens; and hence should not be treated as income of petitioner. All of the remaining income charged to petitioner in respect of Poole for the years 1944 and 1945 (totaling $10,856.39), and all of the income charged to him in respect of Universal for 1945 (being $6,282.87), represents actual distributions made to petitioner in said years out of the Poole bank account and the Universal bank account, which have been described in our Findings of Fact. These two bank accounts, as we have heretofore *64 found, were made up from funds that were obtained from Barr through the use of fictitious invoices, issued in the names of non-existing Poole and Universal Companies, covering materials, services and expenses that likewise were fictitious. The signatories for each of these accounts were the petitioner and his associates, Hughes and Smith; and, except for certain amounts disbursed out of the Poole account in 1945 for the benefit of Barr, all of the balances in both accounts were from time to time distributed to petitioner, Hughes and Smith. The distributions were made by checks which were drawn concurrently to the order of said distributees; which were signed by different combinations of these distributees; and which, except in one instance, were of the same amount for each distributee. All distributions made to the petitioner were deposited in his personal bank accounts. The respondent regarded the Poole and Universal accounts to have been owned personally by petitioner, Hughes and Smith; and accordingly, he included in petitioner's income for the year 1944, not only the amount of $1,677.03 which was actually distributed to him out of the Poole account in said year, but also with *65 one-third of the balance in the Poole account as of the end of the year 1944, on the ground that said sum had been constructively received. The balance of the distributions made to petitioner from the Poole and Universal accounts were included in petitioner's income for the year 1945. Petitioner's position with respect to the distributions received by him from these two accounts was, that the accounts had been set up by his associates, Hughes and Smith, for what he assumed were legitimate purposes connected with the operation of Barr; that he had no knowledge concerning the accounts, although he had signed the signature cards in the same manner that he had signed other instruments on behalf of Barr; and that he thought the distributions made to him out of said two accounts represented reimbursement for expenses that he had incurred on behalf of Barr. He conceded that he had at no time presented any expense voucher, either to any Poole Company or to any Universal Company; and no voucher was found among the records of Barr that could be identified with the above-mentioned distributions. Also, petitioner did not offer in evidence any cancelled check, receipt or other specific evidence, *66 which in any way tended to show that he had made expenditures of such amounts from his personal funds, for which he could have claimed reimbursement from Barr. Moreover, the net worth statement for petitioner, which is set forth in our Findings of Fact, reveals that there was a substantial increase in petitioner's asset position for 1945 (the year in which all distributions from Poole and Universal were deposited in his personal bank accounts), which greatly exceeded the total gross income that he reported on his return for said year. It is our opinion that petitioner not only failed to overcome the presumptive correctness of respondent's determinations respecting the distributions from the Poole and Universal bank accounts in 1944 and 1945; but also that the evidence supports a conclusion that such distributions represented unreported income, and not reimbursements for expenses. It also is our opinion, however, that the several distributions made to petitioner out of the Poole account should be included in his income for the respective years in which such distributions were actually made - without applying the principle of constructive receipt for the year 1944. Our reasons for this *67 latter conclusion are, that the distributions made out of the Poole account in 1944 were, unlike those in 1945, not for equal amounts to petitioner, Hughes and Smith; that a portion of the funds in said account were either returned to Barr or expended for its benefit; and that there is some evidence which would support a conclusion that petitioner may not have become aware of the irregular nature of the Poole account prior to the time when the concurrent distributions of equal amount were made to him, Hughes, and Smith in 1945. Accordingly, we hold that the amounts of unreported income chargeable to the petitioner from the Poole bank account are $1,677.03 for the year 1944, and $9,179.36 for the year 1945; and that the amount of unreported income chargeable to him from the Universal bank account is $6,282.87 for the year 1945. 2. For the year 1944, respondent charged petitioner with additional income from Barr in the amount of $4,000; and for the year 1945, he charged him with additional income from that company in the amount of $15,544.66. These amounts represent portions of payments which Barr made to petitioner (in addition to his salary) in the amounts of $12,432.89 in the year *68 1944, and of $24,249.40 in the year 1945 - all of which were entered on Barr's books to operating expenses, such as travel, sales and advertising. No vouchers covering the amounts which respondent added to petitioner's net income were found among the records of Barr. Petitioner's position with respect to the amounts so included in his income was that he had no knowledge concerning the records of Barr; and that said amounts were reimbursements to him for expenses incurred on behalf of Barr. He made no attempt, however, to identify any item of such expenses, either as to date, character or specific amounts; and, as in the case of the above-mentioned distributions from Poole and Universal, he presented no cancelled checks, vouchers or receipts which would tend to indicate that he made expenditures of such amounts out of his own funds, for which he could have claimed reimbursement from Barr. The evidence discloses, as shown in our Findings of Fact, that several of the payments from Barr to petitioner were made by checks which were issued on the same dates that other checks of similar amount, and bearing closely related check numbers, were issued to petitioner's associates, Hughes and Smith. *69 Also, as we have observed with respect to the distributions of similar character from the Poole and Universal bank accounts, the statement of petitioner's net worth reveals inprovement in his asset position, which indicates that he was receiving income in addition to that reported on his returns. Here again, we conclude that petitioner has not met his burden of proof to overcome the determinations of the respondent. 3. For the year 1944, respondent disallowed a deduction for automobile and entertainment expenses in the amount of $1,565; and for the year 1945, he disallowed a deduction for similar expenses in the amount of $1,000. The only evidence which petitioner presented with respect to these items consists of general statements in his testimony that he had traveled extensively on behalf of Barr, that he had submitted vouchers to that company for his expenses, and that the challenged items represented portions of such expense. As to the item of $1,565, he conceded that he did not have any record or any details, and that he did not "even remember what it was." And so to said item of $1,000, he likewise presented no supporting evidence or detailed explanation. Such general statements, *70 in themselves, are insufficient to establish, either that said amounts actually were expended, or that they qualified for deduction by petitioner, personally. We conclude therefore that petitioner failed to overcome the presumptive correctness of the respondent's determination that said amounts are not deductible. 4. For the year 1944, respondent disallowed a loss claimed on the worthlessness of stock in the James Langley Corporation, on the ground that such loss was not incurred in said taxable year. Petitioner challenged this adjustment; but the only evidence which he presented with regard to the same, was his testimony that said stock was a personal investment. He did not even attempt to establish, either his basis for the stock, or that the stock had become worthless in 1944. Accordingly, as to this item also, we approve respondent's determination because of petitioner's failure of proof. 5. For the year 1945, the respondent added to petitioner's net income, unreported director's fees in the amount of $100, and unreported bank interest in the amount of $123.22. Petitioner assigned no error with respect to either of these adjustments. Thus they are not before us, and the respondent's *71 determinations respecting them stand unchallenged. Based on all the foregoing, we hold that petitioner is chargeable with additional net income in the amounts of $8,242.03 for the year 1944, and of $32,230.11 for the year 1945. II We next consider whether an addition to tax for fraud should be imposed, under section 293(b) of the 1939 Code, [1] for each of the years involved. The burden of proving fraud is on the respondent. Section 1112, 1939 Code. It is well settled that fraud is never presumed; that there is no presumption of correctness attaching to any determination of fraud made by the Commissioner; and that an issue of fraud should be decided on the weight of the evidence. Henry S. Kerbaugh, 29 B.T.A. 1014. If, however, it is found that "any part of any deficiency" for the particular year involved is due to fraud with intent *72 to evade tax, the addition to tax provided by section 293(b) must be imposed. Here, the respondent has relied to carry his burden upon: (1) The facts and circumstances regarding the unreported distributions out of the Poole and Universal bank accounts; (2) the fact and circumstances regarding the disputed payments from Barr; and (3) the increases in petitioner's net worth for the years involved, as reflected in the net worth statement. Petitioner contends that the evidence is insufficient to establish fraud. We agreed with him as to the year 1944, but not as to the year 1945. As regards the year 1944, only one distribution was made to petitioner out of the Poole account; it was in the amount of $1,677.03 which was not equal to the distributions made in that year to Hughes and Smith; and, as we have hereinbefore stated, there is some evidence which would support a conclusion that, at least during December 1944 when the account was first opened, petitioner was not aware of its irregular character. No distribution was received by him in 1944 from the Universal account. And as to the $4,000 disputed payments from Barr in 1944, although we have heretofore found that petitioner failed to *73 overcome the presumptive correctness of respondent's determination that such payments constituted additional income, neither such determination nor such failure of proof is evidence of fraud. Moreover, the increase in petitioner's net worth during 1944 was only $4,180.44; and, although a reconstruction of his net income for said year by the net worth method reflects unreported income of $8,219.32, this is due in large part to the inclusion of living expenses that were estimated. In view of all these circumstances, we have concluded, and we here hold, that respondent has not sustained his burden of proving that any part of the deficiency for the year 1944 was due to fraud with intent to evade tax, within the meaning of section 293(b). As regards the year 1945, however, the situation is different. On January 11 of that year, petitioner received a distribution from the Poole account in the amount of $5,000, which was concurrent with other distributions of exactly the same amount to his associates, Hughes and Smith. About 16 days later, petitioner received another distribution from said account in the amount of $2,000, which was equal in amount to distributions made on the same day to *74 Hughes and Smith. And, on October 16, 1945, the Poole account was closed, and the entire balance therein was distributed concurrently to petitioner, to Hughes and to Smith, in amounts of $2,179.36 each. On the same date of October 16, 1945, that petitioner received one-third of the closing balance of the Poole bank account, he also received a distribution of $6,282.87 out of the Universal bank account. This payment was concurrent with distributions of the same amount made to his associates, Hughes and Smith; and it represented one-third of the entire balance in said account. As we have heretofore pointed out, all funds deposited in the Poole and Universal bank accounts had been accumulated through the presentation to Barr of fictitious vouchers for services and materials which were never furnished; and all the above-mentioned disbursements form these accounts were made by checks which were signed either by petitioner and Hughes, by petitioner and Smith, or by Hughes and Smith. Although petitioner testified that these accounts had been created by Hughes without his knowing their irregular character, it is inconceivable to us that he did not become aware of their irregular character, *75 at least by the time when the several large concurrent distributions of equal amounts were made to him and his associates in 1945. During the months of March, April, May, June, August and October, 1945, petitioner also received payments from Barr in amounts ranging from $1,000 to $2,000 each, which totaled $10,500. On the same dates that these amounts were paid, other payments of similar amount were made to Hughes and Smith, by checks bearing closely related check numbers. Such amounts represented only part of the payments of $15,544.66 from Barr to petitioner, which are here in dispute and in respect of which no supporting vouchers could be found. Petitioner contends that he thought all the above-mentioned payments from Poole, Universal and Barr represented reimbursements of personal funds which he had expended on behalf of Barr. But we can not accept such explanation as creditable, in the light of the information revealed by the net worth statement. This statement shows that during the year 1945, petitioner's total assets increased by more than $27,000, and that his liabilities decreased by approximately $6,500, thereby reflecting an improvement in his net worth of nearly $34,000. *76 We regard to be particularly significant that a substantial portion of this large increase is represented by additional investments of over $11,000 in Government bonds, by two new bank accounts opened during the year in which the year-end balances were approximately $15,000 and $5,000, and also by an increase in his preexisting bank account of approximately $1,150. Yet, the only gross income reported by petitioner on his return for 1945 was compensation from Barr in the amount of $19,602.26, of which $4,021.64 had been withheld at the source for income taxes, so as to leave him with a net balance from that source, before living expenses, of only $15,580.62. Petitioner was a man experienced in business affairs, who was vice-president of the Barr Company, and who was responsible for handling a large volume of sales and also the procurement of materials for that company. Yet, he made no attempt at the trial to explain the said increase in his net worth; whereas the respondent traced into his personal bank accounts, all of the above-mentioned distributions from Poole and Universal, and substantially all of the disputed payments from Barr. There is in our opinion no adequate explanation *77 for petitioner's failure to report said amounts on his return, except that he intended to conceal income and evade the tax. We hold that respondent sustained his burden of establishing that at least part of the deficiency for the year 1945 is due to fraud with intent to evade tax, within the meaning of section 293(b); and we further hold that the addition to tax under said section should be imposed for said year. III. There remain the questions of: (a) Whether an addition to tax under section 294(d)(2), for substantial underestimate of estimated tax, should be imposed for each of the years involved; and (b) whether assessments of deficiencies and additions to tax for said years are barred by the statute of limitations. 1. As regards the additions to tax under section 294(d)(2), the petitioner presented no evidence in opposition to the respondent's determinations. However, the amounts of the additions to tax determined by the respondent must be adjusted, so as to give effect to the revised amounts of net income for each year, which we have hereinbefore found. Such adjustment will be made in the recomputation under Rule 50. 2. As regards the period of limitation for the year 1944, we *78 have hereinbefore found that petitioner received additional income from Poole and Barr in said year, in the aggregate amount of $5,677.03; and this constituted additional gross income as well as additional net income. Said amount is in excess of 25 per cent of the amount of gross income stated in petitioner's 1944 return, which was $18,395.07. By reason of the above facts, section 275(c) of the 1939 Code [2] *79 became applicable and pursuant thereto, the period of limitation for assessment (before any extension thereof) was 5 years. Within such 5-year period, the petitioner and respondent executed a series of consents (Form 872), pursuant to section 276(b), which extended the period for assessment to June 30, 1955. Prior to said date, the notice of deficiency was issued on December 16, 1954; and the result of said notice together with petitioner's appeal therefrom, is that the running of the statute of limitations has been suspended, under section 277 of the Code. We hold, therefore, that assessment for the year 1944 is not barred by the statute of limitations. 3. As regards the period of limitation for the year 1945, we hold, for the reasons which we have expressed in connection with our consideration of the application of section 293(b), that petitioner's return for said year was false or fraudulent with intent to evade tax. Accordingly, assessment for the year 1945 is not barred; and it may be made at any time, as provided in section 276(a) of the 1939 Code. [3]
Decision will be entered under Rule 50. Footnotes
a. Checks issued in 1944, but deposited in payees' bank accounts in 1945. ↩
b. Checks issued for purchase of Barr stock held by the Cohens. c. The above-mentioned payee, William E. Hughes, was a brother of Charles B. Hughes: and the above-mentioned payee, D. P. Gallagher, was the auditor of Barr.↩
*. No consent was executed in respect of the period from June 30, 1952 to April 14, 1954.
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
2. SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION. Except as provided in section 276. - * * *
(c) Omission from Gross Income. - If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.
3. SEC. 276. SAME - EXCEPTIONS. (a) False Return or No Return. - In the case of a false or fraudulent return with intent to evade tax or of a failure to file a return the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.↩